UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| TYRONE WASHINGTON,<br><br>　　　　　　Plaintiff,<br>　v.<br>KERRY INC,<br><br>　　　　　　Defendant. | CASE NO. 2:25-cv-00965-TL<br><br>ORDER ON MOTION TO REMAND |

This matter is before the Court on Plaintiff's motion to remand. Dkt. No. 12. Having reviewed Plaintiff's motion, Defendant's response (Dkt. No. 15), Plaintiff's reply (Dkt. No. 17), and the relevant record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS Plaintiff's motion and REMANDS this matter to King County Superior Court.

### I.   BACKGROUND

The named Plaintiff, Mr. Tyrone Washington, and the class of Plaintiffs are current and former Washington hourly-paid or non-exempt employees of Kerry Incorporated. Dkt. No. 1-2 ¶ 1.2. (complaint). On April 14, 2025, Plaintiff filed a class action lawsuit in King County

Superior Court on behalf of himself and all others similarly situated. Dkt. No. 1-2. Plaintiff claims that Defendant committed wage an hour abuses against its Washington hourly-paid or non-exempt employees. *Id*. ¶ 1.1. Plaintiff alleges nine causes of action against Defendant. Specifically, Plaintiff claims:

> (1) Violations of RCW 49.12.020 and WAC 296-126-092 – Failure to Provide Rest Periods; (2) Violations of RCW 49.12.020 and WAC 296-126-092 – Failure to Provide Meal Periods; (3) Violation of RCW 49.46.130 – Failure to Pay Overtime Wages; (4) Violation of RCW 49.46.090 – Payment of Wages Less Than Entitled; (5) Violations of RCW 49.46.210 and WAC 296-128-620 – Failure to Accrue and Allow Use of Paid Sick Leave; (6) Violations of RCW 49.52.060 and WAC 296-126-028 – Unlawful Deductions and Rebates; (7) Violation of RCW 49.48.010 – Failure to Pay All Wages Due at Termination; (8) Violation of RCW 49.52.050 – Willful Refusal to Pay Wages; and (9) Violation of SMC 14.20.020 – Failure to Pay All Compensation Owed.

*Id*. ¶¶ 6.1–14.8. Plaintiff proposes a class of employees in Washington and a subclass of employees in Seattle. *Id*. ¶¶ 1.1–1.2.

## II.     LEGAL STANDARD

The Class Action Fairness Act ("CAFA") provides federal district courts with original jurisdiction to hear a class action if: (1) the class has more than 100 members; (2) the parties are minimally diverse; and (3) the matter in controversy exceeds $5,000,000. 28 U.S.C. § 1332(d)(2), (d)(5)(B). When a plaintiff challenges the defendant's asserted amount in controversy, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 88 (2014). "[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Id.* at 89.

When calculating the amount in controversy, "a removing defendant is permitted to rely on 'a chain of reasoning that includes assumptions.'" *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019) (quoting *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1199 (9th

1   Cir. 2015)). A defendant's assumptions may be reasonable if they are "founded on the
2   allegations of the complaint." *Id.* Defendants meet their burden of proof when they rely on a
3   "reasonable chain of logic." *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1201 (9th Cir.
4   2015). While the assumptions "cannot be pulled from thin air," *Ibarra*, 775 F.3d at 1199, at this
5   stage, a defendant is also not required to "comb through its records to identify and calculate the
6   exact frequency of violations," *Lopez v. Aerotek, Inc.*, No. C14-803, 2015 WL 2342558, at *3
7   (C.D. Cal. May 14, 2015). However, when the district court identifies a different, better
8   assumption as to the amount in controversy than the assumption presented by the defendant, the
9   district court should consider the claim under the better assumption. *See Jauregui v. Roadrunner*
10  *Transp. Servs., Inc.*, 28 F.4th 989, 995–96 (9th Cir. 2022).

### III.    DISCUSSION

12      On May 21, 2025, Defendant filed a Notice of Removal with this Court, pursuant to the
13  Class Action Fairness Act. Dkt. No. 1 (notice of removal). In its Notice of Removal, Defendant
14  contends that removal is proper under CAFA because: (1) the putative class contains more than
15  100 members (*id.* at 4); (2) minimal diversity exists, as Plaintiff is a citizen of Washington and
16  Defendant is a citizen of Delaware and Wisconsin (*id.* at 7); and (3) because the alleged amount
17  in controversy based on the Complaint exceeds $5,000,000 (*id.*). On June 20, 2025, Plaintiff filed
18  the instant Motion to Remand, arguing that Defendant has failed to prove by a preponderance of
19  evidence that the amount in controversy exceeds $5,000,000 for CAFA jurisdiction. Dkt. No. 12
20  at 7. Plaintiff does not contend that the class is less than 100 members, or that the parties are not
21  minimally diverse.
22      Defendant filed a response on July 11, 2025 (Dkt. No. 15), with Plaintiff filing a reply on
23  July 18, 2025 (Dkt. No. 17). Within the Parties' briefing, they outline their various positions as
24

to the potential amount of damages by providing the Court mathematical calculations as to each category of alleged violation, and the sum of those categories. *See* Dkt. No. 15 and Dkt. No. 17.

### A.     Calculations of the Parties

#### 1.     Defendant's Calculations

Defendant provided a declaration from Tim Skinner, a Rewards Manager for Kerry Inc. that outlines the number of employees, employees' average hours worked in a week, and employees' average hourly pay rates. Dkt. No. 3 (Skinner Decl.). Additionally, Defendant provided a declaration from Brian Paden, a Production and CI Manager for Kerry Inc. that outlines data from the named Plaintiff's work hours between March 1, 2024, and April 1, 2024. Dkt. No. 16 (Paden Decl.). From 2022 to 2024, Defendant employed 194 hourly or non-exempt employees in Washington, which includes 181 hourly or non-exempt employees in Seattle. Dkt. No. 15 at 10. During this same period, Defendant employed an average of 96.15 hourly or non-exempt employees in Washington at a given time, which includes 75.05 hourly or non-exempt employees in Seattle. *Id*. Also, during that time period, the hourly or non-exempt employees in Washington worked an average of 44.29 hours per week, which is 8.86 hours per day. *Id*. Lastly, during that time period, hourly and non-exempt employees in Washington were paid an average hourly rate of $25.78. *Id*.

Defendant characterizes Plaintiff's claims as allegations that Defendant: (1) failed to pay all overtime wages to class members when they worked more than 40 hours in a workweek; (2) failed to pay class members all of the overtime wages to which they were entitled; and (3) failed to pay class members for all hours worked over forty in a week at a rate not less than one and one-half times their regular rate of pay. *Id*. In all its calculations, Defendant uses a 100% violation rate—that is, Defendant assumes that all 96 employees in question have violation claims for every hour they worked during the relevant time period.

### a.     *Alleged Unpaid Overtime for Hours Worked Over 40 in a Workweek*

Defendant asserts that potential damages associated with alleged unpaid overtime are **$828,144.35**. *Id*. at 11. Defendant arrived at this figure by multiplying 96 (total employees) by 52 (total weeks in a year) by three (total years of alleged conduct) by 4.29 (average hours over 40 worked per week). *Id*. That equation gave Defendant the total hours over 40 per workweek, which equated to 64,247.04 hours. *Id*. Defendant then multiplies 64,247.04 (total hours over 40 per workweek) by $25.78 (average hourly pay rate) by 0.5 (overtime premium), which equates to $828,144.35. *Id*.

### b.     *Alleged Failure to Accrue Paid Sick Leave*

Next, Defendant asserts that potential damages associated with alleged unpaid sick leave are **$427,488.50**. *Id*. Defendant arrives at this total by first identifying the total number of sick leave hours. *Id*. Defendant calculates this by multiplying 96 (total employees) by 52 (total weeks in a year) by three (total years of alleged conduct) by one hour of sick leave for every 40 hours worked—the rate at which employees accrued sick leave—to arrive at 16,582. Next, Defendant multiplies 16,582 (total number of sick leave hours) by $25.78 (average hourly pay rate), which equates to $427,488.50. *Id*.

### c.     *Alleged Missed, Short, Late, or Interrupted Meals*

As for alleged missed, short, late, or interrupted meals, Defendant asserts that potential damages are **$926,842.56**. *Id*. at 12. Defendant arrives at this total by first identifying the number of meals per employee in a 50-week period. *Id*. Defendant's calculations assume one meal per employee, per day was missed. *Id*. Defendant calculates the number of meals per employee by multiplying 50 (weeks[1]) by five (shifts per week) by three (total years of alleged conduct), to

---

[1] Defendant does not explain why it sometimes calculates using 52 weeks of alleged conduct, and other times uses 50 weeks of alleged conduct.

ORDER ON MOTION TO REMAND – 5

arrive at 749.[2] *Id*. Next, Defendant calculates the total number of meals by multiplying 96 by 749, to arrive at 71,904. *Id*. To find the amount of damages per meal, Defendant then multiplies $25.78 (average hourly pay rate) by 0.5 (number of hours), which equates to $12.89. *Id*. Lastly, Defendant multiplies $12.89 by 71,904, which equates to $926,842.56. *Id*.

### d.  *Sick Pay Associated with Alleged Noncompliant Meals*

Defendant asserts that potential damages associated with sick pay in relation to alleged non-compliant meals[3] is **$23,171.06**. *Id*. Defendant arrives at this total by first identifying the number of hours from total meals. Defendant calculates the number of hours from total meals by multiplying 71,904 (total number of meals) by 0.5 (number of hours), which equates to 35,952. *Id*. Next, to calculate the number of sick hours, Defendant divides 35,952 by 40 (hours in workweek), which equates to 898.8. *Id*. Lastly, to find out sick pay associated with alleged noncompliant meals, Defendant multiplies 898.8 by $25.78 (average hourly pay rate), which equates to $23,171.06. *Id*.

### e.  *Alleged Missed, Short, Late or Interrupted Rest Breaks*

For alleged missed, short, late, or interrupted rest breaks,[4] Defendant asserts potential damages are **$617,895.04**. *Id*. at 13. Defendant arrives at this total by first identifying the total number of rest breaks per employee. *Id*. Defendant calculates the total number of rest breaks per employee by multiplying 50 (weeks) by five (shifts per week) by two (breaks per shift) by three (total years of alleged conduct), which equates to 1,498.[5] *Id*. Next, Defendant calculates the total number of meals by multiplying the average number of employees (96) by the number of rest

---

[2] Defendant's math is slightly off, as 50 x 5 x 3 = 750, not 749.

[3] Defendant asserts that non-complaint meal breaks are any missed meal breaks, or any meal breaks less than 30 minutes. Dkt. No. 15 at 9.

[4] A full rest break in this context refers to a 10-minute break. Dkt. No. 1-2 at 5.

[5] Defendant's math is slightly off, as 50 x 5 x 2 x 3 = 1,500, not 1,498.

ORDER ON MOTION TO REMAND – 6

breaks per employee (1,498). *Id*. Next, Defendant calculates the amount of damages per rest break by multiplying $25.78 (average hourly pay rate) by 1/6 (hours), which equates to $4.30. *Id*. Lastly, to calculate the total damages for missed, short, late, or interrupted rest breaks, Defendant multiplies 143,808 by 25.78 by 1/6, which equates to $617,895.04. *Id*.

### f. *Sick Pay Associated with Alleged Noncompliant Rests*

Defendant asserts that for sick pay associated with alleged non-compliant rest breaks, the potential damages is **$15,447.38**. *Id*. Defendant arrives at this total by first identifying the total number of rest breaks denied. *Id*. To calculate this total, Defendant multiplies 143,808 (total number of rest breaks) by 1/6 (hours), which equates to 23,968. *Id*. Next, Defendant divides 23,968 by 40 (hours in workweek), which equates to 599.2. *Id*. Lastly, Defendant multiplies 599.2 by $25.78 (average hourly pay rate), which equates to $15,447.38. *Id*.

### g. *Overtime Premium Associated with Alleged Noncompliant Meals and Rests*

Defendant asserts that potential damages for the overtime premium associated with all denied breaks is **$791,678.02**. *Id*. at 14. Defendant arrives at this total by adding the overtime premium for all categories previously mentioned. *Id*. To calculate the overtime premium, Defendant multiplies the total for each category by 0.5, as that is the overtime premium. *Id*.

After adding the amount for each category of alleged violation to the overtime premium for each category of alleged violation, Defendant claims the total potential damages based on the allegations is **$3,630,666.91**. *Id*.

### h. *Attorney Fees and Doubled or Tripled Damages*

Defendant also provides calculations for doubled and tripled damages, as these are claims Plaintiff also makes. *Id*. 15. Defendant asserts that Plaintiff states that all potential non-Seattle employee damages are subject to doubling, and all potential Seattle employee damages are

ORDER ON MOTION TO REMAND – 7

subject to tripling. *Id*. at 14. Of the 96 employees, Defendant asserts 75 were Seattle-based. *Id*. at 15. The remaining 21 employees were non-Seattle employees. *Id*. Defendant also asserts that courts routinely measure potential attorney fees as 25%. *Id*.

The sum of the doubled and tripled damages Defendant asserts is **$15,146,688.52**. *Id*. Defendant arrives at this number by: calculating the proportion of overtime damages ($2,836,458.52 for Seattle employees and $794,208.39 for non-Seattle Washington employees); multiplying the Seattle overtime proportion by three ($8,509,375.57) and non-Seattle Washington proportion by two ($1,588,416.77); multiplying the proportion sums each by 1.25 for attorney fees ($12,764,063.36 Seattle employees and $2,382,625.16 non-Seattle Washington employees); and adding the sums together, which equates to $15,146,688.52. *Id*. **Notably, Defendant miscalculates the attorney fee** rate because Defendant multiplies the tripled and doubled damages by 1.5 (a 50% attorney fee rate), instead of by 1.25. As such, the sums of the tripled Seattle overtime damages ($10,636,719.50) and doubled non-Seattle Washington employee damages ($1,985,520.96) would actually be **$12,622,240.50**.

Under "reasonable alternative calculations," Defendant asserts that the threshold is still met. *Id*. For example, Defendant asserts that "[e]ven if Plaintiff's claim was based solely on noncompliant meal and rest breaks and the overtime failure to accrue sick leave based on them, the threshold is met." *Id*. Calculating the total from noncompliant meal and rest breaks based on a 100% violation rate, the sum of doubled and tripled alleged damages would be **$6,605,563.48**. *Id*. at 16. Additionally, Defendant asserts that even using a 60% violation rate for meal and rest breaks, plus the overtime and failure to accrue sick leave, the damages would be, after appropriately doubling and/or tripling, $3,903,962.24. *Id*. Defendant then adds to the equation overtime premiums not being paid on hours worked over 40, as well as damages from failure to accrue sick leave. *Id*. Defendant calculates both categories at a 30% violation rate, which equates

ORDER ON MOTION TO REMAND – 8

to $376,689.85. *Id*. After tripling the proportion of that number associated with Seattle employees, doubling the proportion of that number associated with non-Seattle employees, and adding those amounts together, the total is $1,047,668.66. *Id*. Adding together the 60% violation rate sum for meal and rest breaks ($3,903,962.24) to the 30% violation rate sum for other overtime and sick leave violations ($1,047,668.66), the total is **$4,951,630.91**. *Id*. This total is before the addition of the standard 25% attorney fee rate.

### 2. Plaintiff's Calculations

Plaintiff begins by asserting that his claim of a "common course" of violations could, based on Defendant's numbers, be anywhere between a 27% violation rate and a 57% violation rate. Dkt. No. 17 at 9. Plaintiff asserts that Defendant's one-month snapshot of time records for the named plaintiff, Mr. Washington, indicates that Plaintiff only missed 27% of his meal breaks. *Id*. Additionally, Plaintiff notes that Defendant mentioned some of Plaintiff's meal breaks were under 30 minutes, and Plaintiff asserts that including those sub-30-minute meal breaks would put the violation rate at 57%. *Id*.

Plaintiff's reply clarifies what he is and is not attempting to recover. *Id*. at 11. To start, Plaintiff makes clear he is not attempting to recover overtime that was already paid. *Id*. Plaintiff concedes that any hours worked over 40 that were recorded by Defendant were likely paid at an overtime rate. *Id*. Because Defendant notes that there was an average of 4.29 hours over 40 worked per week, Plaintiff asserts that the $828,144.35 that Defendant calculates would not be included in the final sum at all, as it was likely already paid. *Id*.

Next, Plaintiff clarifies his position as to the allegation of failure to pay sick leave. *Id*. Plaintiff explains, "Plaintiff specifically alleged that sick leave did not accrue for ***missed breaks***. Plaintiff did not allege that Defendant failed to provide accrual for time actually recorded and paid." *Id*. (citation omitted). Because Plaintiff claims in his reply that Defendant has

ORDER ON MOTION TO REMAND – 9

misinterpreted Plaintiff's complaint and inflated its calculations, Plaintiff does not include the $427,488.50 Defendant calculates from this category in Plaintiff's overall calculations.

For all remaining calculations, Plaintiff provides total potential damages based on a 27% violation rate and total potential damages based on a 57% violation rate. *Id*. 12–13. Plaintiff uses virtually the same mathematical equations as Defendant to calculate the sum of each category of alleged violation. *See* Dkt. No. 17. The only difference between Plaintiff's and Defendant's calculations is that when incorporating the number of weeks worked, Plaintiff uses a 48-week standard, rather than Defendant's 50- and 52-week standard. *Id*. at 12. As such, the Court will not restate Plaintiff's method for calculating the figures that Plaintiff asserts.

As to damages for missed, short, late, or interrupted meals, Plaintiff states that total meal damages based on a 27% violation rate are **$240,063.36**, and damages based on a 57% violation rate are **$507,350.40**. *Id*. Next, for damages for sick leave accrual due to noncompliant meals, Plaintiff asserts that the damages based on a 27% violation rate are **$6,001.58**, and damages based on a 57% violation rate are **$12,683.76**. *Id*. For damages for missed, short, late, or interrupted rest breaks, Plaintiff states total damages based on a 27% violation rate are **$160,454.72**, and total damages based on a 57% violation rate are **$338,646.08**. *Id*. at 13. Lastly, for damages on sick leave accrual associated with alleged noncompliant rest breaks, Plaintiff claims damages based on a 27% violation rate are **$4,011.37**, and damages based on a 57% violation rate are **$8,466.15**. *Id*.

The pre-overtime figure that Plaintiff asserts for potential damages from meal period damages, sick pay for missed meals, rest break damages, and sick pay for missed rest breaks, is $410,445.10 based on a 27% violation rate, and $867,146.39 based on a 57% violation rate. *Id*. at 14. In contrast, Defendant asserts $1,583,356.04 based on a 100% violation rate. *Id*. Including an additional overtime premium based on a 27% violation rate, Plaintiff adds $180,194.47.

Including an additional overtime premium for a 57% violation rate, Plaintiff adds $422,998.24. *Id*.

Notably, Plaintiff and Defendant dispute about where the overtime premium applies. *Id*. Plaintiff asserts that it is unreasonable for Defendant to assume that all violations occurred during a week when overtime occurred, but even assuming so, overtime pay rates should not be applied to sick pay. *Id*. Plaintiff cites to the website for the Washington Department of Labor and Industries for guidance on sick time accrual and rate of pay, and also asserts that overtime premiums should not be applied to sick pay. *Id*.

After doubling and tripling damages and adding 25% in attorney fees, Plaintiff asserts that total potential damages based on a 27% violation rate are **$2,053,395.38**, and total potential damages based on a 57% violation rate are **$3,588,214.75**. *Id*. at 15. However, **Plaintiff's math is incorrect as to the 57% violation rate**. Because Plaintiff did provide enough detail as to his mathematical calculations for total potential damages for a 57% violation rate (*id*.), it is unclear to the Court where Plaintiff erred.

The correct equation for finding total potential damages at a 57% violation rate includes the following multi-step process. The first step includes the following equation: 75 (Seattle employees) ÷ 96 (total average employees) × $1,290,144.63 (total potential damages + total overtime premium) = $1,007,925.49. Next, Plaintiff must triple $1,007,925.49, which equates to a total of $3,023,776.48. Adding 25% attorney fees to that figure equals $3,779,720.60 for the Seattle-employee Plaintiffs. For the 21 non-Seattle employees, the number, after conducting the same math, but for 21 employees, is $705,547.84. Adding the 57% violation rate for Seattle and non-Seattle employees equals **$4,485,268.44**.

//

//

ORDER ON MOTION TO REMAND – 11

B.     **The Court's Determination of the Appropriate Assumptions**

   1.     **Sample Size**

As an initial matter, the Court notes that Defendant extrapolates its estimates of damages from an analysis of the hours worked by the named Plaintiff between March 1, 2024, and April 1, 2024. Dkt. No. 16. While this is a small sample size over a short duration of time, if Defendant is willing to rely on the sample size to estimate the potential damages, then it must allow the Plaintiff and the Court to rely on the same.

   2.     **Violation Rate**

Defendant asserts that the Court may assume a 100% violation rate because: (1) Plaintiff includes no fact-specific allegations that would result in a putative class or violation rate that is discernibly smaller than 100%; and (2) Plaintiff's allegations of a "policy and practice" throughout the complaint support an assumption of a 100% violation rate. Dkt. No. 15 at 7. The Court will address each of these in turn.

   a.     *Plaintiff's allegations generally*

Defendant asserts that "courts may assume that the violation rate is 100% unless the plaintiff specifically alleges otherwise." *Id.* While Plaintiff's Complaint certainly could be clearer and provide more factual allegations,[6] the Court finds Plaintiff has nonetheless specifically alleged that the violation rate in this case is *not* 100%. First and foremost, in each of Plaintiff's claims for relief, Plaintiff specifically states that "the Class and Seattle subclass members (but not all) have been deprived of compensation[.]" Dkt. No. 1-2 ¶¶ 6.10 (First Claim for Relief), 7.10 (Second Claim for Relief), 8.4 (Third Claim for Relief), 9.4 (Fourth Claim for Relief), 10.5 (Fifth Claim for Relief), 11.6 (Sixth Claim for Relief), 12.4 (Seventh Claim for

---

[6] However, the Court also notes that Defendant did not challenge the sufficiency of allegations in Plaintiff's complaint by filing a motion to dismiss and, instead, simply answered the complaint. Dkt. No. 7.

ORDER ON MOTION TO REMAND – 12

Relief), 13.5 (Eighth Claim for Relief), and 14.8 (Ninth Claim for Relief). While Defendants may not be clear as to the frequency of the alleged violations from the complaint, they admit that they understand that the phrase "but not all" "modifies the number of class members." Dkt. No. 15 at 3. In other words, they admit they understand what is otherwise obvious—i.e. that not all of the class member or subclass members were harmed, necessarily implying that there was not a 100% violation rate as to every class member or subclass member for each claim.

Second, to accept Defendant's position would necessitate a re-write of Plaintiff's statement of the nature of the action, requiring in particular that the word "all" be either inserted or removed from the allegations as written to get to a 100% violation rate. For example, Plaintiff alleges that Defendant "fail[ed] to provide employees with the rest breaks to which they [were] entitled." Dkt. No. 1-2 ¶ 1.1. To get to Defendant's 100% violation theory would require the word "all" be inserted into the allegation: Defendant failed to provide *all* employees with *all* the rest breaks to which they were entitled. Similarly, Plaintiff alleges that Defendant "fail[ed] to pay *all* overtime wages to employees when they work[ed] more than 40 hours in a workweek." Dkt. No. 1-2 ¶ 1.1 (emphasis added). But Defendant's interpretation would only work if Plaintiff had alleged that Defendant failed to pay overtime wages to *all* employees when they worked more than 40 hours in a workweek.

As Defendant must acknowledge, a plaintiff is the master of his complaint (*see* Dkt. No. 15 at 7), and a defendant cannot re-write the complaint to fit an interpretation it seeks. Wage-and-hour lawsuits typically involve "off-the-clock" claims or allegations that employees performed work outside of their recorded working hours and for which they were not compensated. It is, after all, rare for an employer to not pay workers for *recorded* time, given how that would make an employer a sitting duck for blatant violation of wage-and-hour complaints. Plaintiff confirms this is the case here, as well in his reply brief, conceding that any

ORDER ON MOTION TO REMAND – 13

hours worked over 40 that were recorded by Defendant were likely to have been paid at an overtime rate.[7] Dkt. No. 17 at 11. This is also borne out by the allegations in the Complaint. For example, Plaintiff asserts a claim for "*each missed* rest break" (again, not *all* rest breaks), "*each missed* meal break" (again, not *all* meal breaks), and proper compensation for those missed breaks. Dkt. No. 1-2 ¶¶ 6.8, 7.8, 8.3 (emphases added).

For these reasons, the Court finds that Defendant's interpretation of Plaintiff's Complaint—resulting in its assumption that all putative class members failed to receive all rest breaks, meal breaks, overtime pay, etc.—is unreasonable in the face of the specific disclaimer in every single claim, as well as in the general wording of Plaintiff's Complaint. *See Young v. Lab'y Corp. of Am.*, No. C23-5892, 2024 WL 689605, at *9 (W.D. Wash. Feb. 20, 2024) (finding that defendant's assumption that none of the class members received any rest breaks, meal breaks, or overtime payments was an unreasonable assumption).

### b.    *Plaintiff's allegations regarding a "policy and practice"*

Defendant asserts that "[a]llegations of a 'policy and practice' throughout a complaint without more may support an assumption of 100 percent violation rate." Dkt. No. 15 at 7. Plaintiff does not use the phrase "policy and practice" in his Complaint. However, Plaintiff refers to Defendant's alleged conduct as a "common course" numerous times. *See* Dkt. No. 1-2. Plaintiff provides dictionary definitions of the word "common" to mean "occurring or appearing frequently," and the term "course" to mean, "a way of acting." Dkt. No. 12 at 12 (citations omitted). The question for the Court, then, is what violation rate should apply where the alleged unlawful conduct admittedly occurs frequently.

---

[7] Whether Defendant paid at an overtime rate is a separate inquiry from, and Plaintiff does not concede as much, whether Defendant properly calculated that overtime rate in the first place. Dkt. No. 17 at 11.

The Court begins with the Ninth Circuit's instruction that a "pattern and practice" of alleged conduct does not necessarily mean the defendant always engaged in the alleged conduct. *See Ibarra*, 775 F.3d at 1198–99. Defendant cites *Young* in support of its position that an allegation of a "policy and practice" (or its equivalent) supports an assumption of a 100% violation rate. Dkt. No. 15 at 8. But *Young* specifically recognizes that "[e]ven if Plaintiff's complaint alleged a 'pattern and practice' of labor law violations . . . , this would not necessarily imply that Defendants *always* violated the law." *Young*, 2024 WL 689605, at *4 (citing *Ibarra*, 775 F.3d at 1199). Further, *Young* also noted that "[e]ven in cases where the complaint alleges a defendant engaged in a 'common course of conduct' and intentionally adopted policies and practices that violated the law, these passing comments do not necessarily dilute a complaint's 'overarching allegations of sporadic and intermittent practices.'" *Id.* (citations omitted). And significantly, the *Young* court ultimately utilized a 20% violation rate. *Id.* at *9.

District courts in this circuit have found that when the alleged violations are defined as a "pattern and practice," or similar language, a 20% to 60% violation rate is appropriate. *See, e.g.*, *Danielsson v. Blood Ctrs. of Pac.*, No. C19-4592, 2019 WL 7290476, at *6 (N.D. Cal. Dec. 30, 2019) (court found that where plaintiff alleged "pattern and practice" of violation of meal and rest breaks, a 20% violation rate was appropriate); *Oda v. Gucci Am., Inc.*, No. C14-7468, 2015 WL 93335, at *5 (C.D. Cal. Jan. 7, 2015) (court found 50% violation rate appropriate when the complaint alleged defendant used "policies and procedures" that violated California law, maintained a "policy and practice" of not paying proper compensation for missed meal and/or rest periods, and "sometimes" violated labor laws); *Alvarez v. Off. Depot, Inc.*, No. C17-7220, 2017 WL 5952181, at *3 (C.D. Cal. Nov. 30, 2017) (court found that a 60% violation rate was reasonable for violations defined as a "uniform practice" when plaintiff and class members were always effectively "on duty," including during rest breaks). Lastly, a "common practice" of

alleged violations has been found to be a 50% violation rate. *Soratorio v. Tesoro Refining Mktg. Co., LLC*, No. C17-1554, 2017 WL 1520416, at *3 (C.D. Cal. Apr. 26, 2017) (finding defendant's assumption of 50% violation rate reasonable where plaintiff alleged defendant had "common practice" of failing to provide required breaks).

In the present case, it is unreasonable to assume a 100% violation rate where: (1) Plaintiff repeatedly claims the violations were a "common course"; and (2) Plaintiff makes clear that the alleged violations did not apply to every employee. This District has found that assuming a 100% violation rate is unreasonable when the defendant's calculations are based on the assumption that all class members never received the proper breaks or overtime. *Young*, 2024 WL 689605, at *9 (citations omitted). Additionally, this assumption is unreasonable particularly considering Plaintiff is not alleging the class members never received the proper breaks or overtime payments. Dkt. No. 1-2 ¶¶ 6.8, 7.8, 8.3; *see also supra* Section III.B.2.a. Lastly, as previously mentioned, when the district court identifies a different, better assumption as to the amount in controversy than the assumption presented by the defendant, the district court should consider the claim under the better assumption. *See Jauregui*, 28 F.4th at 996.

      **c.**  *A 57% Violation Rate is Appropriate*

A 57% violation rate is appropriate in this case. Defendants extrapolate their estimates of damages from an analysis of the hours worked by the named Plaintiff between March 1, 2024, and April 1, 2024. Dkt. No. 16. Plaintiff reviewed the alleged violations in this time frame and stated that the violation rate is between 27% and 57%—the latter including the allegations of sub-30-minute meal breaks that were only a few minutes shy of 30. Dkt. No. 17 at 9. As stated, it is reasonable for both Plaintiff and the Court to rely on estimates from the same time frame.

Using a 27% violation rate would be far too low, as violation rates in that general area are largely defined as "at times," which generally implies the alleged illegal conduct occurred at a

20% violation rate, *see Young*, 2024 WL 689605, at *5, and did not happen consistently, *see id*. As stated, by Plaintiff's definition of "common course," Plaintiff asserts the alleged violations happened frequently (Dkt. No. 12 at 12), which implies more than merely "at times."

A 57% violation rate is more in line with what case law provides on the issue. In *Soratorio*, the district court found that when the plaintiff alleged that the defendant had a "common practice" of failing to provide required breaks and failing to provide a thirty-minute meal period for every five hours worked, along with other allegations, that a 50% violation rate was appropriate. *Soratorio*, 2017 WL 1520416, at *3. Although the court in *Soratorio* stated that all allegations the plaintiff made could be seen as a 100% violation rate, the court made sure to not come to that conclusion because "common practice" is not the same as a "uniform practice," and "uniform practice" would have better supported a 100% violation rate. *Id*. Further, case law shows that "uniform practice" can be seen at a 60% violation rate. *Alvarez*, 2017 5952181, at *3. The facts in *Alvarez* clearly show a more frequent violation rate than the allegations in the present case, as the facts in *Alvarez* outlined that class members were effectively always on duty because they were required to always carry their radios and/or pagers and respond at all times. *Id*. Here, Plaintiff does not claim that class members were essentially always on the clock. As such, a 60% violation rate is too high for the present case.

As stated, when the district court identifies a different, better assumption as to the amount in controversy than the assumption presented by the defendant, the district court should consider the claim under the better assumption. *Jauregui*, 28 F.4th at 996. The Court believes a 57% violation rate to be reasonable.

3. **Weeks of Work**

Defendant calculates alleged unpaid overtime for hours worked over 40 in a workweek, and for alleged failure to accrue paid sick leave, by assuming that every employee worked all 52

weeks in a calendar year. Dkt. No. 15 at 10–11. It is unreasonable to assume that every employee worked every week in a calendar year. *Deaver v. BBVA Compass Consulting & Benefits, Inc.*, No. C13-222, 2014 WL 2199645, at *5 (N.D. Cal. May 27, 2014) (finding that defendant's calculation that assumed every class member worked every week of their employment was an assumption "belied by common sense"). In other categories, Defendant calculates under an assumption that every employee worked 50 weeks in a year, which is also too high to assume. *See id.* (finding it appropriate to reduce aggregate number of work weeks (52 weeks) by ten percent). Instead, factoring for employees taking vacation, sick leave, or other forms of leave is more appropriate when assuming how many weeks employees worked in a calendar year. *Id*. As such, the Court agrees with Plaintiff's assertion that it is more likely that employees worked a maximum of 48 weeks in a calendar year. *See* Dkt. No. 17 at 10.

### 4.     Categories of Recovery

As stated, Plaintiff asserts that he is not attempting to recover overtime that was already paid, and he concedes that overtime that was recorded was likely paid. Dkt. No. 17 at 11. For those reasons, the Court will not include alleged unpaid overtime for hours worked over 40 in a workweek. Dkt. No. 17 at 11. More specifically, that means that the Court will not consider as potential damages the $828,144.35 that Defendant asserts for overtime hours worked. Additionally, Plaintiff asserts that Defendant's calculations for alleged failure to accrue paid sick leave should also be excluded. *Id*. Plaintiff makes clear that he is not attempting to recover accrued sick leave that has already been provided, and he cites to his complaint where he alleges sick leave did not accrue for missed breaks. *Id*. As such, the Court will not consider the $427,488.50 that Defendant asserts as potential damages for alleged failure to accrue paid sick leave.

To calculate the potential amount in controversy, the Court will calculate the potential damages owed for: (1) missed, short, late, or interrupted meals; (2) sick leave accrued for noncompliant meals; (3) missed, short, late, or interrupted rest breaks; and (4) sick leave accrued for alleged noncompliant rest breaks. Additionally, the Court will account for the statutory doubling and tripling of damages, as the parties calculated. Dkt. No. 15 at 14–15; Dkt. No. 17 at 15. Lastly, because courts in this District routinely use 25% of potential damages as the share for attorney fees, the Court will incorporate that into the calculation as well. *See e.g., Young*, 2024 WL 689605, at *9; *Sumo v. PSL Assocs., LLC*, No. C25-5436, 2025 WL 2624531, at *3 (W.D. Wash. Sept. 11, 2025).

### 5. Overtime Premiums

Defendant adds overtime premiums to meal period damages, sick pay damages for missed meals, rest break damages, and sick pay damages for missed rests. Dkt. No. 15 at 14. Plaintiff argues that an overtime premium should not be added to sick time accrual. Dkt. No. 17 at 14–15. The Court agrees with Plaintiff. First, it is generally accepted that accrued sick time does not accrue at an overtime premium rate. Second, Plaintiff provides a helpful resource to support this claim by providing a link to the Washington Department of Labor and Industries ("L&I") website, as these claims arise out of employees in Washington. Dkt. No. 17 at 14. L&I provides, "You must pay your employees' normal hourly compensation for each hour of paid sick leave that they use" and "Normal hourly compensation does not include . . . other premium rates, including overtime." *Paid Sick Leave Minimum Requirements*, Wash. State Dep't of Lab. & Indus., https://www.lni.wa.gov/workers-rights/leave/paid-sick-leave/paid-sick-leave-minimum-requirements#rate-of-pay [**https://perma.cc/B9RY-FMDJ**]. The Court will incorporate overtime premiums for meal period damages and rest break damages, but not for sick pay.

C.  **CAFA Amount in Question**

Using a 57% violation rate, the CAFA amount in question is **$4,485,268.44**. Therefore, under the Class Action Fairness act, remand back to King County Superior Court is proper.

IV.  CONCLUSION

The Court finds that the Defendant has failed to prove by a preponderance of evidence that the amount in controversy exceeds $5,000,000. Accordingly, the Court GRANTS the Plaintiffs motion and REMANDS this case back to King County Superior Court.

Dated this 5th day of November, 2025.

Tana Lin
United States District Judge